## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| TRAVIS W. MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.  07-1253 |
| | ) | |
| FRANK L. SHAW, ROGER E. WALKER, JR. | ) | |
| BARBARA HURT, RICHARD BARD, | ) | |
| LAURA NORTON and PAUL CAMPBELL | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OF LAW IN SUPPORT
### OF DEFENDANTS' MOTION TO DISMISS

NOW COME the Defendants, FRANK L. SHAW, ROGER E. WALKER, JR.,

BARBARA HURT, RICHARD BARD, LAURA NORTON and PAUL CAMPBELL (collectively,

"Defendants"), by and through their attorney, Lisa Madigan, Attorney General for the State of

Illinois, and for their Memorandum of Law in Support of Motion to Dismiss pursuant to

Fed.R.Civ.P. 12(b)(6), states unto the Court as follows:

## I.  INTRODUCTION

On September 26, 2006, Plaintiff, Travis W. Moore, filed his six count complaint

herein.  The complaint alleges that each of the Defendants, in their individual and official

capacities, deprived Plaintiff of a property interest without due process of law when Plaintiff's

position changed from sergeant to correctional officer at the request of Plaintiff's union and

pursuant to an arbitration proceeding.

Defendants respectfully request that Plaintiff's complaint be dismissed for the

following reasons: (i) the facts, as alleged in the complaint, show that Plaintiff was not

deprived of procedural due process; (ii) Defendants, in their individual capacities, are

protected by the doctrine of qualified immunity, and (iii) Plaintiff's claims against Defendants

in their official capacity are barred by sovereign immunity

## II.  STANDARD OF REVIEW

When considering a Motion to Dismiss under Rule 12(b)(6) the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff.  Pickrel v. City of Springfield, 45 F.3d 1115 (7th Cir. 1995).  The Court will dismiss a complaint under Rule 12(b)(6) if it appears the plaintiff has not alleged facts that would entitle him to relief.  *See* Conley v. Gibson, 335 U.S. 41 (1957).

## III.  ARGUMENT

### 1.    The facts, as alleged in the complaint, demonstrate that Plaintiff was not deprived of a property interest without due process of law.

In deciding a motion to dismiss under Rule 12(b)(6), the Court need not "ignore any facts set forth in the complaint that undermine the plaintiff's claim or assign any weight to unsupported conclusions of law."  N. Ind. Gun & Outdoor Shows, Inc. v. South Bend, 163 F.3d 449, 452 (7th Cir. 1998)(citation omitted).  Defendants are entitled to use the plaintiff's pleadings to show that a claim for relief has not been stated:

> If the plaintiff chooses to provide additional facts, beyond the short and plain statement requirement, the plaintiff cannot prevent the defense from suggesting that those same facts demonstrate the plaintiff is not entitled to relief.

Thompson v. Ill. Dep't of Prof. Regulation, 300 F.3d 750, 753 (7th Cir. 2002)(citation omitted).  A plaintiff's own words may show that there is no cognizable claim.  See id.  If a plaintiff chooses to plead particulars and they show she has no claim, she has pleaded herself out of court.  Jefferson v. Ambroz, 90 F. 3d 1291, 1296 (7th Cir. 1996).  Accordingly, the proper inquiry is not what Plaintiff did not allege, but what he did allege.  See McCready v. Ebay, Inc., 453 F.3d 882, 888 (7th Cir. 2006).

In order for Plaintiff to make out a due process claim, he must show that (1) the Defendants deprived him of a constitutionally protected interest in life, liberty, or property,

and (2) the procedures employed by the Defendants were constitutionally deficient.

Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460 (1989).  Due process "is not

a technical conception with a fixed content unrelated to time, place[,] and circumstances[;]"

instead, it "is flexible and calls for such procedural protections as the particular situation

demands."  Mathews v. Eldridge, 424 U.S. 319, 334 (1976).  Plaintiff alleges that he was not

provided with a pre-deprivation and post-deprivation hearing regarding his demotion and that

consequently, he was deprived of a property interest without due process of law.

### A.    Plaintiff was not denied a pre-deprivation hearing concerning his demotion.

In the complaint, Plaintiff alleges that he was not provided with both a pre-deprivation

and post-deprivation hearing with regard to his demotion.  Plaintiff further alleges that the

failure to provide both hearings constitute a denial of due process.  Despite Plaintiff's

contention, it is not always necessary to provide a pre-deprivation hearing.  *See* Ellis v.

Sheahan, 412 F. 3d 754, 758 (7th Cir. 2005) (stating "it does not make a lot of sense to say

that when a postdeprivation hearing not only is feasible but will give the deprived individual a

completely adequate remedy, as is true in this case, due process requires a right to a

predeprivation hearing as well.  Such a rigid approach would be inconsistent with the spirit, at

least, of the sliding-scale approach of Mathews, which requires comparison of the costs and

benefits of alternative remedial mechanisms.").  Inasmuch as due process does not always

require a pre-deprivation hearing, Defendants do not concede that Plaintiff is entitled to a

pre-deprivation hearing given the circumstances of the case at hand.  However, strictly for

purposes of Defendants' Motion to Dismiss, Defendants will assume that a pre-deprivation

hearing was necessary.

Defendants assert that the facts, as alleged by Plaintiff, demonstrate that his interests

were in fact represented at a number of hearings prior to his demotion.  Article I, Section 1 of

the Agreement between AFSCME and the State of Illinois Department of Central

Management Services (the "Agreement")[1], provides that "the employer recognizes the union

as the sole and exclusive bargaining representative in all matters establishing and pertaining

to wages and salaries, hours, working conditions and other conditions of employment for

employees ..."  (Exhibit A, p. 2).

In the complaint, Plaintiff acknowledges that AFSCME, is the bargaining

representative for correctional officers and sergeants at Hill Correctional Center, including

himself.  (Comp. ¶¶ 14, 35).  The Plaintiff further asserts that (i) AFSCME filed a grievance

challenging his promotion, (ii) such grievance was eventually submitted to binding arbitration,

and (iii) a three day hearing was held before an arbitrator.  (Comp. ¶ 14).  In addition, the

complaint alleges that at the conclusion of the three day hearing, it was determined that a

correctional officer more senior to Plaintiff should be promoted to sergeant instead of

Plaintiff.  (Comp. ¶ 20).  Finally, the complaint provides that Plaintiff requested AFSCME file

and pursue a grievance on his behalf challenging his demotion and that AFSCME refused.

(Comp. ¶ 35).

All hearings regarding the grievance, including the final three-day hearing before an

arbitrator, occurred prior to Plaintiff's demotion.  AFSCME, the sole and exclusive bargaining

representative for Plaintiff, was present and participated in, all hearings throughout the

grievance procedure.  When a resolution could not be reached, AFSCME asked an arbitrator

to decide which employee, Plaintiff or the correctional officer who was more senior than

---

[1] Although Plaintiff did not attach the Agreement to his Complaint, he refers to the fact that AFSCME represents all correctional officers and sergeants and that AFSCME filed a grievance challenging his promotion.  Consequently, the terms of the agreement are central to Plaintiff's claim.  Therefore, it is proper for this Court to consider the Agreement without going beyond the bounds of the Complaint.  See Wright v. Associated Ins. Cos. Inc., 29 F.3d 1244, 1248 (7th Cir. 1994)(citation omitted) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.").

Plaintiff, should receive the promotion to sergeant. The arbitrator determined that the correctional officer more senior to Plaintiff should receive the promotion. It is immaterial that the grievance was initiated by AFSCME at the request of the correctional officer challenging Plaintiff's promotion and not by Plaintiff. What is important is the fact that AFSCME, Plaintiff's sole and exclusive representative, was present at the hearings regarding Plaintiff's promotion. It is further important that Plaintiff's interests were represented and considered as the determination was made with regard to who should be promoted to sergeant, which fact is evidenced by the fact that AFSCME refused to initiate a grievance challenging Plaintiff's demotion.

Inasmuch as (i) AFSCME is the "sole and exclusive" bargaining representative for correctional officers and sergeants at Hill Correctional Center, including Plaintiff, (ii) AFSCME filed a grievance challenging Plaintiff's promotion, (iii) a number of hearings were held with regard to the grievance challenging Plaintiff's promotion, (iv) such hearings resulted in a decision by an arbitrator that a correctional officer more senior than Plaintiff should be promoted to the rank of sergeant rather than Plaintiff, and (iv) AFSCME refused to file a grievance on behalf of Plaintiff appealing Plaintiff's demotion, Plaintiff's interests were, in fact, represented by AFSCME in a number of hearings prior to his demotion. Based upon the facts as alleged in Plaintiff's complaint, Plaintiff was not deprived of a pre-deprivation hearing.

> **B.    The facts, as alleged, show that Plaintiff failed to take advantage of the grievance procedures established pursuant to the AFSCME Agreement and consequently, his due process rights were not violated.**

Furthermore, the Special Grievance section of Appendix B of the Agreement provides a special grievance process for grievances related to demotions. Such section specifically provides that "appeals of ... demotions ... shall be filed as a written grievance at a

special Step 3 meeting with the agency head or designee within ten (10) working days of becoming aware of such action." (Exhibit A, p. 227). Grievance procedures created by collective bargaining agreements can satisfy the requirements of due process. Hudson v. City of Chicago, 374 F.3d 554, 563 (7th Cir. 2004) *citing* Buttitta v. City of Chicago, 9 F.3d 1198, 1201 (7th Cir. 1993) (holding that the post-deprivation grievance procedure available to Chicago police officers under their collective bargaining agreement satisfied due process); Winston v. United State's Postal Serv., 585 F.2d 198, 209-210 (7th Cir. 1978) (holding that the multi-step grievance procedure for postal workers satisfied due process).

Plaintiff alleges that he requested that AFSCME file a grievance on his behalf challenging his demotion and that AFSCME refused to file such grievance. The fact that an employee's union representative refuses to file a grievance on behalf of the employee does not establish that the employer has violated the employee's procedural due process rights. *See* Hudson 374 F.3d at 563-564; *Also see* Dusanek v. Hannon, 677 F.2d 538, 543 (7th Cir. 1982). "[A] state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them." Dusanek, 677 F.2d at 543. Further, in Hudson, the Seventh Circuit stated

> Although the Union allegedly refused to initiate grievance proceedings on the Plaintiff's behalf, this does not affect the analysis of whether the City violated the due process rights of Hudson and Pamon. Plaintiff's argue that the CBA does not allow individuals to initiate grievance proceedings for AWOP terminations on their own. Even if this is true (the City insists that individuals may bring grievances on their own), the Plaintiffs could have sued the Union for breach of its duty to fairly represent their interests-the City should not be blamed for the mistakes of the Union.

Hudson 374 F.3d at 563-564.

Given the holding in Hudson, the reason that Plaintiff failed to avail himself of the procedures available for appealing his demotion are immaterial. What is important is that the

grievance procedures do exist and are available to Plaintiff.  Plaintiff has alleged in his complaint that he did not initiate grievance procedures because AFSCME refused to do so on his behalf - not that grievance procedures do not exist and were not available to him.  Consequently, Plaintiff cannot show that he was not afforded procedural due process, and Plaintiff cannot succeed on his due process claims and such claims should be dismissed.

### 2.     The Defendants are protected by the doctrine of qualified immunity.

Plaintiff's alleged violations of his procedural due process rights are barred by the doctrine of qualified immunity.  Unless it has been authoritatively decided that certain conduct is forbidden, the public official is entitled to qualified immunity.  Rice v. Burks, 999 F.2d 1172, 1174 (7th Cir. 1993).  In this analysis, "the first inquiry must be whether a constitutional right would have been violated on the facts alleged; second, assuming the violation is established, the question whether the right was clearly established must be considered on a more specific level . . . ."  Saucier v. Katz, 533 U.S. 194, 200 (2001).  It must be clear to a reasonable official that her conduct was unlawful in the specific circumstances she confronted.  Id. at 202.  For qualified immunity to be surrendered, preexisting law must dictate, that is truly compel . . . the conclusion for every like-situated, reasonable government agent that what he is doing violates federal law *in the circumstances*."  Khuans v. School District 10, 123 F.3d 1010, 1020-21 (7th Cir. 1997).

Inasmuch as it was not clearly established that the grievance procedures available to Plaintiff did not provide all the process he was due, Defendants are entitled to qualified immunity with respect to Plaintiff's procedural due process claims.  In determining whether due process was satisfied, a court must balance (1) the private interest in retaining employment; (2) the risk of an erroneous deprivation of the interest through the procedures used, and the probable value, if any, of additional procedural safeguards; and (3) the

government's interest, including the function involved and the burdens that additional procedures would entail.  Mathews v. Eldridge, 424 U.S. 319, 335 (1976); *see also* Wallace v. Tilley, 41 F.3d 296, 299-300 (7th Cir. 1994).  The Seventh Circuit has recognized that a grievance procedure under a collective bargaining agreement can satisfy due process. Buttitta v. City of Chicago, 9 F.3d 1198, 1206 (7th Cir.1993) (*citing* Winston v. United States Postal Service, 585 F.2d 198, 209-210 (7th Cir.1978)).

In this case, Plaintiff had available to him a grievance procedure incorporated into the collective bargaining agreement.  (Exhibit. A).  Plaintiff chose not to avail himself of such procedure when AFSCME refused to represent him.  As in Hudson and Dusanek, the Plaintiff had available procedural protections and simply refused to avail himself of such procedures. Hudson 374 F.3d at 563-564; Dusanek 677 F.2d at 543.  Consequently, Plaintiff cannot establish that he was deprived procedural due process.  Further, because a very similar grievance procedure has been held by the Seventh Circuit to provide a plaintiff will all the process he was due, it was not clearly established that the alleged conduct of the Defendants violated due process.  Therefore, Defendants are entitled to qualified immunity as to Plaintiff's procedural due process claims.

**3.      Plaintiff's due process claims are barred by sovereign immunity.**

Plaintiff brings his complaint against Defendants in their official capacities "for purposes of implementing equitable relief."  (Comp. ¶¶ 2-7).  Because Defendants are sued in their official capacities, section 1983 claims against them are barred by the Eleventh Amendment. The Supreme Court held in Will v. Michigan Dept. of State Police, 491 U.S. 58 (1989), "Obviously, state officials literally are persons, but a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." Will, 491 U.S. at 71 *citing* Brandon v. Holt, 469 U.S. 464, 471 (1985).  Therefore, in order for

Plaintiff to bring a section 1983 action against the named state official defendants in their official capacities, the claim would have to fall with one of the three recognized exceptions.

As the Seventh Circuit has noted, the three specific exceptions to Eleventh Amendment immunity are (1) Congress has abrogated the state's immunity from suit through an unequivocal expression of its intent to do so through a valid exercise of its power; (2) a state has properly waived its immunity and consented to suit in federal court; and (3) the plaintiff seeks prospective equitable relief for ongoing violations of federal law under the Ex Parte Young doctrine. Sonnleitner v. York, 304 F.3d 704 (7th Cir. 2002) *citing* Marie O. v. Edgar, 131 F.3d 610, 614-15 (7th Cir. 1997), Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 55-56 (1996), and Ex Parte Young, 209 U.S. 209 at 159-60 (1908). Because Congress has not abrogated the Eleventh Amendment immunity through the Civil Rights Act, Owen v. Lash, 682 F.2d 648, 654 (7th Cir. 1982), and the state has not waived its immunity to such claims, Duckworth v. Franzen, 780 F.2d 645, 649 (7th Cir. 1985), Plaintiff must attempt to bring the present action against the state officials, in their official capacity, through the Ex Parte Young exception.

In Ex parte Young, the Supreme Court held that in order to ensure the enforcement of federal law, the Eleventh Amendment permits suits for prospective injunctive relief against state officials for ongoing violations of federal law. Id., *see also* Edelman v. Jordan, 415 U.S. 651 (1974). In this case, Ex parte Young does not apply. The Ex parte Young exception applies only to prospective equitable relief for *ongoing violations* of federal law. Marie O., 131 F.3d at 614-615. In this case, Plaintiff sues the Defendants in their official capacities for "purposes of implementing equitable relief." (Comp. ¶¶ 2-7). The equitable relief sought by Plaintiff is the entry of a declaratory judgment determining the actions alleged in the complaint are in violation of 42 U.S.C. Sec. 1983 and 1988, an injunction directing

Defendants to refrain from engaging in any action with respect to Plaintiff which are prohibited under 42 U.S.C. Sec. 1983 and 1988, and to reinstate Plaintiff to the position of sergeant with all the employment duties, responsibilities, salaries, benefits and rights attendant to that position.

However, the Complaint makes it clear that Plaintiff is complaining of conduct directed at him personally and specifically those events giving rise to his demotion.  Further, the Seventh Circuit has held that an employee who is deprived of a property interest without due process of law does not suffer an ongoing violation of his rights. Sonnleitor v. York, 304 F.3d 704 (7th Cir. 2002).  In Sonnleitor, the Court noted that the violation at issue was not a demotion of the plaintiff, but rather the fact that the demotion occurred without a proper hearing.  Id. at 718.  Since the failure to offer a proper hearing was a completed act, the plaintiff was not claiming on ongoing violation.  Id.  See also Doe v. Board of Trustees, 429 F.Supp.930, 941 (N.D. Ill. 2006).  Because there is no allegation of any ongoing violations of federal law, the Ex Parte Young exception does not apply.  Inasmuch as Plaintiff has failed to plead an ongoing violation of federal law and because he seeks an "equitable" remedy for an alleged past wrong, his claims against the Defendants in their official capacities are barred by the Eleventh Amendment and should be dismissed.

## IV.  CONCLUSION

The facts, as alleged in Plaintiff's complaint, establish that Plaintiff's right to procedural due process was not violated.  Consequently, Plaintiff has pled himself out of court and his claims should be dismissed.  Further, Because it was not clearly established that the grievance procedures available to Plaintiff did not provide him all the process he was due, Defendants are entitled to qualified immunity.  Finally, inasmuch as Plaintiff does not allege an

ongoing constitutional violation, the <u>Ex Parte Young</u> exception does not apply and Defendants

are entitled to sovereign immunity.

Respectfully submitted,

FRANK L SHAW, ROGER E. WALKER, JR.,
BARBARA HURT, RICHARD BARD, LAURA
NORTON and PAUL CAMPBELL,

Defendant,

LISA MADIGAN, Attorney General,
State of Illinois,

Attorney for Defendant,

By:  s/ Amy D. Gerloff_____
    Amy D. Gerloff
    Assistant Attorney General
    500 South Second Street
    Springfield, Illinois  62706
    Telephone:  (217) 785-4555
    Facsimile:   (217) 524-5091
    E-Mail:  agerloff@atg.state.il.us
    Attorney Bar #: 6283925

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| TRAVIS W. MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.  07-1253 |
| | ) | |
| FRANK L. SHAW, ROGER E. WALKER, JR., | ) | |
| BARBARA HURT, RICHARD BARD, | ) | |
| LAURA NORTON and PAUL CAMPBELL | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2007, I electronically filed Defendants'

Memorandum of Law in Support of Defendant's Motion to Dismiss with the Clerk of Court

using the CM/ECF system which will send notification of such filing to the following:

James P. Baker
Brendabakerlaw@sbcglobal.net

and I hereby certify that on December 21, 2007, I mailed by United States Postal Service, the

document to the following non-registered participant:

None.

Respectfully submitted,

By: s/Amy D. Gerloff
Amy D. Gerloff, 6283925
Assistant Attorney General
Attorney for Defendants
500 South Second Street
Springfield, IL  62706
(217) 785-4555
Fax: (217) 785-4555
agerloff@atg.state.il.us

E-FILED
Friday, 21 December, 2007 04:37:41 PM
Clerk, U.S. District Court, ILCD



# AGREEMENT

between

# AFSCME

American Federation of State,

County and Municipal Employees,

Council 31, AFL-CIO



and

# STATE OF ILLINOIS

Department of

Central Management Services



July 1, 2004 – June 30, 2008

| RC-06-0CB | RC-09-0CB | RC-10-0CB | RC-14-0CB |
| RC-28-0CB | RC-42-0CB | RC-62-0CB | RC-63-0CB |

**EXHIBIT**

A

ency Head and superior to
aining unit, including, but
ators in Human Services,
loyment Security, Superin-
strict Engineers in Trans-
Natural Resources, Division

RC-28, RC-62 and RC-63
of an Agency in a County,
be considered a work loca-
e parties in supplemental

gs with more than twenty-
unit;

ich constitute a facility in
Corrections, Children and

fice in counties adjacent to
l office, which offices shall

l safety committees, where
hin a building or related
be considered together as
nder RC-6 and RC-9 shall
se agreed to by the parties

RC-42, RC-62 and RC-63,
it employee in a classifica-
a certified or probationary
ree, an employee during an
od, has no right to use the
arge or demotion.

rticular facility or institu-
Human Services, Children
hichever is applicable.

e and exclusive bargaining
l pertaining to wages and
conditions of employment
ement" and composed of
ch other classifications as
ns of this Agreement. The
rgaining units contained
fact that they are all con-
at any provision or policy
other, unless otherwise so

ssification

ons, or abolish, or merge,

---

The Union shall be notified of the Employer's interest to establish new classifications, or abolish, or merge, or change existing classifications and discuss with it such intention at least twenty-one (21) days prior to making its recommendation to the Civil Service Commission. If the Employer subsequently determines to establish new classifications, or abolish, or merge, or change existing classifications, it shall negotiate with the Union over the impact of such.

Such negotiations shall include good faith impact bargaining as required under the State Labor Relations Act.

In the event the parties are unable to reach agreement, the Union may appeal through the contractual grievance procedure (Art. V) including Arbitration. The issue before the Arbitrator shall be whether or not the employee's rights have been violated as provided in the Agreement, and if so what the remedy should be.

Nothing in this Section shall diminish any rights provided for in other Sections of this Agreement.

### Section 3. Integrity of the Bargaining Unit

A. The Employer recognizes the integrity of the bargaining unit and will not take any action having the effect of eroding bargaining unit work. Subject to the provisions of this Agreement, the Employer will continue to endeavor to assign bargaining unit work to bargaining unit employees. The hiring of temporary or emergency employees to supplement bargaining unit employees' work on a temporary basis or provisional employees appointed under Personnel Rule 302.150 shall not be considered erosion of the bargaining unit.

B. Emergency, temporary and provisional appointments shall be made in accordance with Section 8(b)(8); 8(b)(9); and 8(b)(10) of the Personnel Code. The Union shall be notified in writing on a monthly basis of the name, agency, title and position allocation number of all emergency, temporary and provisional appointments made to bargaining unit positions.

C. In the event that a back-to-back emergency, temporary, or provisional appointment, or a combination of appointments, is operationally necessary, upon timely request the Union will be provided with the rationale for such back-to-back appointment. The provision of rationale to the Union will be made in a timely fashion.

D. Unless Agency operational needs so require, no emergency, temporary, provisional or contractual employee shall be assigned to work a schedule of hours or days off if there is an employee in the same position classification and work location who desires such a schedule of hours and days off.

### Section 4. Union Exclusivity

The Employer shall not meet, discuss, confer, subsidize or negotiate with any other employee organization or its representatives on matters pertaining to hours, wages, and working conditions. Nor shall the Employer negotiate with employees over their hours, wages and working conditions, except as provided herein.

## ARTICLE II

### Management Rights

### Section 1. Rights Residing in Management

Except as amended, changed or modified by this Agreement, the Employer retains the exclusive right to manage its operations, determine

[3]

The Union shall be notified of the Employer's interest to establish new classifications, or abolish, or merge, or change existing classifications and discuss with it such intention at least twenty-one (21) days prior to making its recommendation to the Civil Service Commission.

If the Employer subsequently determines to establish new classifications, or abolish, or merge, or change existing classifications, it shall negotiate with the Union over the impact of such.

Such negotiations shall include good faith impact bargaining as required under the State Labor Relations Act.

In the event the parties are unable to reach agreement, the Union may appeal through the contractual grievance procedure (Art. V) including Arbitration. The issue before the Arbitrator shall be whether or not the employee's rights have been violated as provided in the Agreement, and if so what the remedy should be.

Nothing in this Section shall diminish any rights provided for in other Sections of this Agreement.

## Section 3. Integrity of the Bargaining Unit

A. The Employer recognizes the integrity of the bargaining unit and will not take any action having the effect of eroding bargaining unit work. Subject to the provisions of this Agreement, the Employer will continue to endeavor to assign bargaining unit work to bargaining unit employees. The hiring of temporary or emergency employees to supplement bargaining unit employees' work on a temporary basis or provisional employees appointed under Personnel Rule 302.150 shall not be considered erosion of the bargaining unit.

B. Emergency, temporary and provisional appointments shall be made in accordance with Section 8(b)(8); 8(b)(9); and 8(b)(10) of the Personnel Code. The Union shall be notified in writing on a monthly basis of the name, agency, title and position allocation number of all emergency, temporary and provisional appointments made to bargaining unit positions.

C. In the event that a back-to-back emergency, temporary, or provisional appointment, or a combination of appointments, is operationally necessary, upon timely request the Union will be provided with the rationale for such back-to-back appointment. The provision of rationale to the Union will be made in a timely fashion.

D. Unless Agency operational needs so require, no emergency, temporary, provisional or contractual employee shall be assigned to work a schedule of hours or days off if there is an employee in the same position classification and work location who desires such a schedule of hours and days off.

## Section 4. Union Exclusivity

The Employer shall not meet, discuss, confer, subsidize or negotiate with any other employee organization or its representatives on matters pertaining to hours, wages, and working conditions. Nor shall the Employer negotiate with employees over their hours, wages and working conditions, except as provided herein.

# ARTICLE II

## Management Rights

## Section 1. Rights Residing in Management

Except as amended, changed or modified by this Agreement, the Employer retains the exclusive right to manage its operations, determine

[3]

authority who is subordinate to the Agency Head and superior to first-level supervisors outside the bargaining unit, including, but not limited to, Local Office Administrators in Human Services, Public Aid, Regional Managers in Employment Security, Superintendents at institutional facilities, District Engineers in Transportation, Regional Land Managers in Natural Resources, Division of Land Management.

d) "Work Location" under RC-10, RC-14, RC-28, RC-62 and RC-63 shall be defined as all of the premises of an Agency in a County, except that each of the following shall be considered a work location, unless otherwise agreed to by the parties in supplemental negotiations.

 1) A building or related group of buildings with more than twenty-five (25) employees in the bargaining unit;

 2) A building or group of buildings which constitute a facility in the Departments of Human Services, Corrections, Children and Family Services, or Veterans' Affairs;

 3) Branch offices of a central regional office in counties adjacent to such regional offices, and the regional office, which offices shall be grouped as a work location.

Provided that, for purposes of health and safety committees, where more than one Agency has offices within a building or related group of buildings, all such offices shall be considered together as a work location. The "Work Location" under RC-6 and RC-9 shall be defined as d) 2) above, unless otherwise agreed to by the parties in agency supplemental negotiations.

e) For RC-6, RC-9, RC-10, RC-14, RC-28, RC-42, RC-62 and RC-63, "Employee" refers only to a bargaining unit employee in a classification covered by this contract whether in a certified or probationary status except that a probationary employee, an employee during an original six (6) month probationary period, has no right to use the grievance procedure in the event of discharge or demotion.

f) "Facility Head" refers to the Head of a particular facility or institution of the Department of Corrections, Human Services, Children and Family Services, Veterans' Affairs, whichever is applicable.

## ARTICLE I

### Recognition

**Section 1. Recognition**

The Employer recognizes the Union as the sole and exclusive bargaining representative in all matters establishing and pertaining to wages and salaries, hours, working conditions and other conditions of employment for employees in the units described in "Agreement" and composed of classifications attached in Schedule A, and such other classifications as may be added in accordance with the provisions of this Agreement. The parties recognize that there are eight (8) bargaining units contained herein; each separately certified, and that the fact that they are all contained within this Agreement shall not imply that any provision or policy affecting or benefiting one unit applies to any other, unless otherwise so provided.

**Section 2. Abolition or Merger of Job Classification**

The Employer may, establish new classifications, or abolish, or merge, or change existing classifications.

[2]

# Appendix B – Memoranda of Understanding

Bargaining Unit Exclusion Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . 212

Bumping of Trainee Employee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

Call-Back Pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

Classification Study . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

Closure of a Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

Commercial Driver's License . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

Commercial Driver's License Drug & Alcohol Testing . . . . . . . . . . . 214

Day Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215

Day Care Feasibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215

Disaster Service Volunteer Leave . . . . . . . . . . . . . . . . . . . . . . . . . . 215

Flexible Hours, Article XII, Section 12 . . . . . . . . . . . . . . . . . . . . . . 215

Generalist Series – Department of Human Services . . . . . . . . . . . . . 216

Governor's Volunteer Initiative . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

Grace Periods, Late Arrivals, Early Departure . . . . . . . . . . . . . . . . 217

Ground Rules For Multi-Agencies Step 3 Grievance Committee . . . 217

Illinois Self-Insured Motor Vehicle Liability Plan . . . . . . . . . . . . . . 218

Internet Access to the CMS Job Posting System . . . . . . . . . . . . . . . 218

Hepatitis B Vaccinations (Dept. of Corrections) . . . . . . . . . . . . . . . 218

Intermittent Conversion (Dept. of Employment Security Only) . . . . 218

Layoff Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 218

Layoff – Temporary, Provisional, Emergency Employees
    (Article XX, Section 2 (e)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

New, Merged, or Changed Classification – Salary Grade . . . . . . . . 219

Non-Code Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

Part-Time Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

Past Practice, Increase or Decrease in Fringe Benefits . . . . . . . . . . 220

Pension Credits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

Personal Property Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

Personal Service Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 222

Personal Service and Vendor Contracts . . . . . . . . . . . . . . . . . . . . . 223

Position Classification – Promotions . . . . . . . . . . . . . . . . . . . . . . . . 223

RC-42 Job Bidding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

[210]

Red-Circling, Pay on Promotion .............................. 224

Selection in Place of Recall List ........................... 224

Sick Leave, RC-6 & RC-9 ................................. 225

Sick Leave Bank ......................................... 225

Skill Tests ............................................. 226

Smoking Policies ........................................ 226

Special Grievances ...................................... 227

Supplemental Agreements Arbitration Procedure .............. 229

Supplementary Agreements ................................ 229

Tax Exempt Benefits .................................... 231

Temporary Assignment to the Generalist Series .............. 231

Trainee Titles .......................................... 231

Transfer Policy for RC-6 Employees ....................... 234

Transfer Policy for RC-9 Employees ....................... 235

Vacancy Listing ......................................... 236

Welfare and Welfare to Work Program – All Units .............. 236

[211]

## BARGAINING UNIT EXCLUSION PROCEDURE

The process enumerated herein exists to allow the Employer and the Union to come to an agreement on changes in excluded or included status of existing permanent positions, either filled or vacant, within titles covered by the bargaining unit. The parties intend to use this process to avoid litigation before the Illinois Labor Relations Board (ILRB) regarding changes in status of certain positions and regarding status of vacant positions the State is contemplating filling.

1. If the Employer intends to exclude a vacant position from the Bargaining Unit, or the Union intends to include a previously excluded position in the Bargaining Unit, the moving party will notify the other party via fax or phone of its intent. The Employer/Union will provide information to the other party, such as the reason for the inclusion/exclusion, the affected Agency involved, the position number, the incumbent (if applicable), the job description, or any other documentation deemed relevant by the parties. The Employer/Union will respond, in writing, as to its position regarding the information within ten (10) working days.

2. If the parties reach an agreement regarding the inclusion or exclusion of a position, a joint unit clarification petition on that position will be filed with the ILRB. The parties shall operate as if the petition has been granted pending certification of the petition.

3. If the parties do not reach agreement and the issue is scheduled for hearing, the parties' representatives shall have further discussions to attempt to reach an agreement. If no agreement can be reached, the hearing will proceed as scheduled.

4. For "split titles" that exist as of the date of this Side Letter, the parties agree to file joint petitions within 90 days of the date of this Side Letter to amend the ILRB certifications so that all positions within said titles are included within the AFSCME bargaining units, with the exception of those positions specifically identified as excluded.

5. The Parties agree that those individual positions currently excluded from AFSCME bargaining units by existing labor board certifications shall continue to be excluded in the petitions referenced in paragraph four above. Both Parties reserve the right to seek labor board determination to resolve any remaining dispute over positions that are inappropriate for inclusion or exclusion.

Executed: September 22, 2004

## BUMPING OF A TRAINEE EMPLOYEE

The parties agree that during the implementation of Article XX, Section 3 (c) through (h) (bumping), an employee in a trainee position classification within the classification series or an employee in a trainee position classification who has a targeted title to a position within a classification series of an employee subject to layoff shall be included in the bumping process.

Executed: July 1, 2004

## CALL-BACK PAY

It is understood by the parties that any employee called back to work outside his/her regularly scheduled shift shall be paid a minimum of 2 hours

[212]

pay each and every time he or she is required to go out, that is to leave the employee's residence and return to the worksite or area of assignment.

Executed: July 1, 1986
Renewed: July 1, 2004

## CLASSIFICATION STUDY

The Employer shall begin a classification study prior to January 1, 2006 for the following titles:

> Accountant and Accountant Advanced in the Department of Transportation's Motor Fuel Unit
>
> Office Assistants and Office Associates (Timekeeping and Payroll)
>
> Social Worker III (Forensic)

The Employer shall begin a classification study prior to January 1, 2006 to research the feasibility of semi-automatic advancement for the Office Assistant to Office Associate.

Executed: July 1, 2004

## CLOSURE OF A FACILITY

It is understood by the parties that within sixty (60) days of the Employer's announcement of the closure or conversion of a facility (facility as defined in Definition of Terms d)2)), the parties agree to negotiate over such matters that may impact upon employees covered by this agreement on questions of wages, hours and other conditions of employment.

Executed: July 1, 1986
Renewed: July 1, 2004

## COMMERCIAL DRIVER'S LICENSE

Employees may only be required to possess a commercial driver's license if it is required by the classification specification, or if it is a bona fide requirement in the job description. Employees whose position requires possession of a commercial driver's license or who the Employer requires to operate a vehicle requiring a commercial driver's license pursuant to the Commercial Motor Vehicle Safety Act shall be provided reasonable time off without loss of pay to participate in training the employee might need to prepare for passage of the commercial driver's test and to take the test itself.

The Employer shall also make available its vehicles to employees who shall be granted reasonable amounts of time without loss of pay to practice for the driving portion of the commercial driver's test.

Employees shall be permitted to continue employment in their position even if they have not passed the commercial driver's test as long as the law allows them to continue operating their assigned vehicle(s).

Employees who are not permitted by law to operate their assigned vehicle because of their failure to pass the commercial driver's exam shall be considered as subject to layoff for the purposes of exercising transfer or voluntary reduction rights pursuant to Article XX, Section 3j of the Master Agreement, but shall not be entitled to rights pursuant to Article XX, Section 3a through 3i.

Employees who are unable to exercise rights under Article XX, Section 3j of the Master Agreement shall be terminated and entitled to recall, only if they possess the necessary driver's license, or to a position in which previously certified, for a period not to exceed two years. It shall be the employees' obligation to inform the Employer that they have received the license.

Executed: July 1, 1991
Revised: July 1, 2004

[213]

## CDL DRUG AND ALCOHOL TESTING

The parties agree in order to protect the safety of employees and the public, the workplace should be free from the risk posed by employees impaired by the abuse of alcohol and controlled substances. While the parties recognize that abuse of alcohol and controlled substances is a treatable illness, employees found to be impaired while on duty shall be subject to discipline.

Employees who, because of the requirements of their position, are required to possess a Commercial Driver's License (CDL), shall be subject to drug and alcohol testing according to the following:

Employees Bidding on Positions Requiring a CDL: An employee covered by the Master Contract who bids on position requiring a CDL shall be subject to the same drug testing procedures as employees currently in a position requiring a CDL. If such an employee tests positive, the employee shall be discharged.

Post-accident: Where the accident involved the loss of human life or the employee received a citation for a moving traffic violation arising from the accident.

Random: Annual testing of safety-sensitive employees for alcohol and controlled substances pursuant to the guidelines utilized by the Federal Department of Transportation.

Reasonable Suspicion: As provided in this Agreement.

Testing Procedures: All testing procedures shall meet no less than the minimum standards established under the U.S. Department of Transportation regulations.

Employee Notification: Employees subject to this Memorandum shall receive a copy of the Memorandum.

Reasonable Suspicion: Reasonable suspicion exists if specific objective facts and circumstances warrant rational inferences that a person may be under the influence of alcohol or a banned substance. Reasonable suspicion may be based upon among other matters:

a. Observable phenomena such as direct observation of use or the physical symptoms of using or being under the influence of controlled substances such as, but not limited to: slurred speech, direct involvement in a serious accident, or disorientation.

b. A pattern of abnormal conduct or erratic behavior.

c. Information provided either by reliable and credible sources or which is independently corroborated.

Positive Test Results: All drug and alcohol test results will be reviewed and interpreted by a Medical Review Officer (MRO). If the laboratory reports a positive result to the MRO, the MRO will contact the employee and will interview the employee to determine if there is an alternative medical explanation for the drugs found in the employee's urine specimen. If the employee provides appropriate documentation and the MRO determines that it is legitimate medical use of the prohibited drug, the drug test result is reported as negative to the Employer. The employee will be required to sign a release of information in the event that a physician must be contacted for clarification or verification.

Nothing precludes an employee from seeking reimbursement costs for a test pursued by the employee which proves the employee was not positive as indicated in the original test.

Confidentiality of Records: Records concerning testing of employees will be maintained confidentially.

[214]

<u>Refusal to Test:</u> Refusal to submit to a test, attempts to tamper or adulterate the test, or positive results which cannot be justified will be considered a positive finding.
<u>Discipline:</u> If just cause is established as a result of the predisciplinary meeting, discipline for violations shall be discharge.
<u>Employee Assistance Programs:</u> The Employer and the Union fully support the employee assistance programs and encourage employees to seek the confidential services of AFSCME's PSP program. These programs play an important role by providing employees an opportunity to eliminate illegal drug use. Referral can be made to appropriate treatment and rehabilitative facilities who follow-up with individuals during their rehabilitation period to track their progress and encourage successful completion of the program.
Executed: May 21, 1996
Revised: July 1, 2004

## DAY CARE

It is understood by the parties that, subject to all applicable laws, rules and regulations, there shall be an opportunity for eligible employees to obtain at least a portion of their dependent day care costs on a favorable tax basis effective October 1, 1986.
Executed: July 1, 1986
Renewed: July 1, 2004

## DAY CARE FEASIBILITY

Upon request, the Employer agrees to conduct daycare feasibility studies in those agencies at each worksite with 50 or more employees.
Effective: July 1, 1994
Renewed: July 1, 2004

## DISASTER SERVICE VOLUNTEER LEAVE

Pursuant to Public Act 87-638, an employee who is a certified disaster service volunteer of the American Red Cross may be granted leave from his/her work without loss of pay for not more than 20 working days in any 12 month period. Such leave shall be for the purpose of participating in specialized disaster relief services for the American Red Cross in the State of Illinois. The leave shall be at the request of the American Red Cross and subject to approval of the employee's agency director.
Executed: November 12, 1991
Renewed: July 1, 2004

## FLEXIBLE HOURS — ARTICLE XII, SECTION 12

In interpreting the Flexible Hours provision the parties recognize as precedent Arbitrator Witney's ruling in 14-151-84 that "The employee's right to flextime must be balanced against the work requirements of the Employer. Full consideration of the establishment, adjustment or discontinuation of flextime must be given to both elements of the equation. Such determinations must be made on a case-by-case basis in the light of the evidence which bears upon the issue. Should the evidence demonstrate that flextime interferes with the work requirements of the Employer, an employee is not entitled to flexible hours despite whatever compelling reasons an employee offers to obtain the benefit. On the

[215]

other hand, where the designation of a flextime position does not conflict with the work requirements or operating needs of the Employer, the employee is entitled to a flexible hours schedule." (Pursuant to P.A. 79-558)
Executed: July 1, 1986
Renewed: July 1, 2004

## GENERALIST SERIES — DEPARTMENT OF HUMAN SERVICES

It is agreed between the Department of Human Services and AFSCME that implementation of Article XIX, Section 8 of the present Collective Bargaining Agreement shall be as follows:

1. When a vacancy occurs in the Generalist Series (i.e., Mental Health Specialist classifications) it shall be posted for bidding as specified in the Collective Bargaining Agreements.

2. Selection of employees to fill such vacancies shall be in accordance with Section 5 of Article XIX. No CMS-100B form shall be required for such selection, although the employee must be qualified for the position.

3. After selection, the employee, if not yet trained, shall fulfill the training requirements of the classification. Pay during on-the-job training shall be in accord with the Temporary Assignment Pay Article of the Contract, if they are performing the duties of the position for which they are selected.

4. After successful completion of the training, the employee shall fill out the CMS-100B form in accordance with Section 5(A) of Article XIX. The Employer shall then send the CMS-100B to the Department of Central Management Services for grading.

5. Upon receipt of the employee's grade on the CMS-100B, the Employer shall promote the employee to the proper classification assuming the employee is reachable on the eligible list.
Executed: December 12, 1984
Renewed: July 1, 2004

## GOVERNOR'S VOLUNTEER INITIATIVE

Programs under the Governor's Volunteer Initiative will be viewed as supplemental to, not a replacement for, bargaining unit work. Specifically, programs will not be directed to displacing currently employed staff, reducing hours, reducing the level of funding for personal services that would otherwise be made available for non-volunteer work or reduction in the customary level of services provided by employees.

Such programs may be maintained in which volunteers are doing bargaining unit work except when:

a. A bargaining unit position normally performing such tasks is vacant within the appropriate organizational unit and there are sufficient unreserved funds in personal services available, or the Agency has legally determined that other funds are available that can be utilized to pay employee(s) in a vacant position.

b. A bargaining unit employee qualified to perform such tasks is on layoff within the organizational unit and there are sufficient unreserved personal services funds available or the Agency has legally determined that other funds are available that can be utilized within such unit to pay employee(s).

If funds are not available and volunteers are utilized, in the following fiscal year the Agency shall make every effort to secure funds to fill the vacant position(s) and/or recall the laid off employees if it wishes to continue the utilization of said volunteers. The Agency will keep the Union informed of the efforts being made to secure funds to fill the vacant position(s) and/or recall the laid off employees.

[216]

Notice of each volunteer program under the Initiative will be made to AFSCME Council 31, identifying the work locations and summarizing the type of tasks to be performed.

Executed: April 29, 1993
Renewed: July 1, 2004

## GRACE PERIODS, LATE ARRIVALS, EARLY DEPARTURE

1. All past practices in the Department of Public Aid concerning all grace periods regarding tardiness and all past practices regarding the three times tardy per month and excused early departure leave shall cease effective December 31, 1984.
2. The Employer will establish policies and/or criteria relating to above matters that will be consistent with similar programs of other State agencies.
3. The new policies will be applied in a uniform, objective, non-arbitrary and non-capricious way.
4. The Employer agrees that violations of the new policies will solicit supervisory responses which give due consideration to mitigating circumstances, if they exist and other related factors.
5. Employees whose attendance stayed within the parameters of the previous guidelines will start with a clean slate with regard to the above-referenced matters.

Executed: December 12, 1984
Renewed: July 1, 2004

## GROUND RULES FOR MULTI-AGENCIES
## STEP 3 GRIEVANCE COMMITTEE

1. To orderly facilitate the disposition of grievances on each monthly Step 3 agenda, the parties agree to conduct the Step 3 committee meetings in a manner that is supportive of the Statement of Principle in Article V of the Master Collective Bargaining Agreement.
2. The monthly meetings shall be scheduled pursuant to Article V, Section 2, Step 3. Each session shall begin at 9:00 a.m. and end at 5:00 p.m. at a mutually agreed location.
3. The parties agree there shall be one spokesperson for the Employer and one spokesperson for the Union. However, either party may call upon a member of their respective teams on an as needed basis.
4. The Agency shall send to Central Management Services all third level grievances received from the Union each month. Central Management Services will prepare the master agenda which shall then be sent to the Union ten (10) working days prior to the scheduled meeting. The Union shall return such draft with additions and modifications five (5) working days prior to the meeting. A grievance will not appear on the third level agenda unless a signed and dated grievance has been presented to the Agency Head or designee. The Employer reserves the right to raise the issue of timeliness pursuant to Article V.
5. Grievance resolutions shall be signed by the parties at the meeting using an agreed upon form, unless the parties mutually agree otherwise.
6. Travel and attendance at the meeting shall be pursuant to Article V, Section 2, Step 3. The Employer reserves the right to require sign-in sheets to verify attendance.

Executed: July 1, 2000
Revised: July 1, 2004

[217]

## ILLINOIS SELF-INSURED MOTOR VEHICLE LIABILITY PLAN

It is understood by the parties that, pursuant to the Illinois Self-Insured Motor Vehicle Liability Plan, employees (insureds) are covered for motor vehicle liability insurance when acting for and on behalf of the Employer while within the course of employee's employment. It is understood that private automobile insurance carried by a State employee is considered primary, and must be exhausted before the State's liability plan is engaged. If other insurance is in force, coverage under the State's plan shall be excess over the other insurance. It is understood that the Illinois Self-Insured Motor Vehicle Liability Plan makes no provision for physical damage to vehicles owned by employees (insureds).
Executed: July 1, 2000
Renewed: July 1, 2004

## INTERNET ACCESS TO THE CMS JOB POSTING SYSTEM

The Employer will provide the Union with a link to the CMS Job Posting System on the Union's website (www.afscme31.org).
Executed: July 1, 2004

## HEPATITIS B VACCINATIONS

Department of Corrections employees who have direct contact with inmates shall, upon request, be provided with vaccinations for Hepatitis B.
Effective: July 1, 1994
Renewed: July 1, 2004

## INTERMITTENT CONVERSION DEPARTMENT OF EMPLOYMENT SECURITY ONLY — ARTICLE XX, SECTION 5

Employees shall be permitted to convert to an Intermittent title in lieu of layoff, provided the employee has been previously certified in the classification series of the Intermittent title.

Those employees who choose to convert to intermittent status to avoid layoff shall retain recall rights to their former position classification.
(RC-62 Only)

An intermittent employee with a minimum of 13,650 hours of continuous service who is non-scheduled for two (2) consecutive pay periods shall be permanently assigned, upon request, to any other cost center in his/her region where work is available and a less senior intermittent is scheduled. Such transaction will not require posting. This option may only be exercised once in a federal fiscal year (October 1 through September 30). Such employee shall, however, be entitled to return to the cost center assignment held immediately prior to exercising this option at any time during the federal fiscal year.
Renewed: July 1, 1997
Renewed: July 1, 2004

## LAYOFF PLAN

No layoff plan shall be established which results in the positioning of a non-bargaining unit employee for a vacant position which otherwise

[218]

ICLE LIABILITY PLAN

suant to the Illinois Self-
yees (insureds) are covered
ing for and on behalf of the
loyee's employment. It is
rance carried by a State
be exhausted before the
rance is in force, coverage
the other insurance. It is
otor Vehicle Liability Plan
shicles owned by employees

B POSTING SYSTEM

ink to the CMS Job Posting
.org).

TIONS

have direct contact with
inations for Hepatitis B.

ARTMENT OF
XX SECTION 5

Intermittent title in
ously certified in the

ent status to avoid
n classification.

urs of continuous
periods shall be
enter in his/her
an is scheduled.
y only be exer-
ptember 30).
e cost center
at any time

ning of
nse

---

would subsequently have been available to a bargaining unit employee on layoff, or targeted for layoff pursuant to Article XX, Sections 3 and 4.
Executed: July 1, 1994
Renewed: July 1, 2004

## LAYOFF
## TEMPORARY, PROVISIONAL, EMERGENCY EMPLOYEE — ARTICLE XX, SECTION 2 (e)

The parties agree that the intent of Article XX, Section 2 (e), Layoff — General Procedures, is that temporary, provisional, and emergency employees, outside the organizational unit but in the work location, in the same position classification as an employee subject to layoff, shall be terminated non-certified only if a certified or probationary employee subject to layoff elects to and is qualified to perform the duties of a temporary, provisional or emergency employee. The certified or probationary employee shall perform the duties for the remainder of the temporary, provisional or emergency appointment. Upon completion of that time frame, such employee may be considered laid off and shall have recall rights as set forth in Article XX, Section 4, Recall.

This procedure, if applicable, shall take place upon completion of the process set forth in Article XX, Section 3, Bumping and Transfer in Lieu of Layoff and shall not be applicable to employee(s) who have exercised his/her rights under Article XX, Section 3, Bumping and Transfer in Lieu of Layoff (i.e. employees who bump or select a vacancy).
Executed: July 1, 2004

## NEW, MERGED, OR CHANGED CLASSIFICATION — SALARY GRADE

If after good faith impact bargaining, the parties are unable to reach agreement on the proper pay grade for a new, merged, or changed classification, the reasonableness of the proposed salary grade shall be arbitrated pursuant to Article XXVI, Section 8.
Executed: July 1, 2000
Renewed: July 1, 2004

## NON-CODE EMPLOYEES

Positions exempt or partially exempt from the Personnel Code due to the scientific, technical or engineering nature of the duties, as determined by statute, that are included in a classification covered by the Master Collective Bargaining Agreement shall be subject to the provisions of the Master Agreement.

It is understood that for the purpose of Filling of Vacancies and Layoff non-code employees shall have no contractual rights to code positions and code employees shall have no contractual rights to non-code positions. Therefore, the Filling of Vacancies and Layoff language shall be applied to non-code employees separate and apart from code employees within the affected agency.

However for Layoff purposes only, a non-code employee shall be offered a vacant code position for which he/she is qualified and eligible to avoid layoff in his/her employing agency pursuant to Article XX, Section 3 (j) or any other agency pursuant to Article XX, Section 3 (k). Such employee must meet the minimum qualifications for the vacancy as determined by the Department of Central Management Services.

It is understood that all references made in the Master Agreement regarding the Personnel Rules and the Pay Plan are inapplicable to

[219]

exempt scientific, technical and engineering employees, and the Agreement shall be read as if the references were to the employing agency's rules and or regulations.

Each agency may negotiate a separate Supplemental Agreement to address other issues specific to non-code employees covered by the Master Agreement.

Executed: July 1, 2004

## PART-TIME EMPLOYEES

A. Except as set forth below there shall be separate lines of bumping for full-time and part-time employees.

Full-time employees may bump part-time employees, seniority permitting, pursuant to Article XX of the Master Contract. Part-time may not bump full-time employees to avoid layoff. Full-time employees may not bump part-time employees and part-time employees may not bump full-time employees to change shifts, or for any other purpose that bumping is permitted under the master or supplemental agreements.

It is understood that the practice of grouping employees by classification for purposes of layoff (irrespective of part-time or full-time status) shall continue.

A full-time employee recalled to a part-time position may, at the employee's option, accept or refuse such assignment and remain on the recall list for a full-time position.

A part-time employee recalled to a full-time position may, at the employee option, accept or refuse such assignment and remain on the recall list for a part-time position.

For the purpose of filling of vacancies, the parties agree that in cases when the posted vacancy is for a full-time position, the priorities listed in Article XIX Section 2 shall be applied first to any full-time bidder and then to any part-time bidder.

A part-time employee who is selected for a full-time position shall have his/her seniority pro-rated at the time he/she becomes a full-time employee based on the percentage of hours the employee was scheduled to work at the time of selection. However, a part-time employee who is selected for a full-time position and returns to a part-time position, shall have his/her seniority date revert to the date held prior to becoming a full-time employee.

A part-time employee who is laid off shall have his/her seniority pro-rated at the time of layoff based on the percentage of hours the employee was scheduled to work at the time of the layoff.

B. Notwithstanding any other provision of the Master Agreement, part-time employees shall be paid at the rate of one and one-half times the employee's straight time hourly rate for all time worked in excess of the normal work day or work week for like full-time employees.

Such payment shall be cash or compensatory time in accordance with the provisions of the Master Agreement.

Executed: July 1, 1994
Revised: July 1, 2004

## PAST PRACTICE, INCREASE OR DECREASE IN FRINGE BENEFITS ALL UNITS REGARDING ARTICLE XXXIV, SECTION 3

The parties hereby agree that no change in past practice with regard to an increase or decrease in fringe benefits enjoyed by employees shall

[220]

take place without the mutual agreement of the Department of Central Management Services and the Union, except as provided for in Article XXXIV, Section 3.

Executed: December 12, 1984
Renewed: July 1, 2004

## PENSION CREDITS SIDE LETTER

An individual who represents or is employed as an officer or employee of a statewide labor organization that represents members of the State Employees Retirement System may participate in the State Employees Retirement System and shall be deemed an employee, provided that (1) the individual has previously earned creditable service under Article XIV of the Pension Code, (2) the individual files with the State Employees Retirement System an irrevocable election to become a participant, and (3) the individual does not receive credit for that employment under any other section of the Pension Code. Such employee is responsible for paying to the State Employees Retirement System both (i) employee contributions based on the actual compensation received for service with the labor organization and (ii) employer contributions based on the percentage of payroll certified by the Board; all or any part of these contributions may be paid on the employee's behalf or picked up for tax purposes (if authorized under federal law) by the labor organization. A person who is an employee as described in this side letter may establish service credit for similar employment prior to becoming an employee as described herein by paying to the State Employees Retirement System for that employment the contributions specified in this side letter, plus interest at the effective rate from the date of service to the date of payment. However, credit shall not be granted pursuant to this side letter for any such prior employment for which the applicant received credit under any other provision of the Pension Code, or during which the applicant was on a leave of absence.

By paying the required contributions, plus an amount determined by the Board to be equal to the employer's normal cost of the benefit plus interest, an employee who was laid off but returned to State employment under circumstances in which the employee is considered to have been in continuous service for purposes of determining seniority may establish creditable service for the period of the layoff, provided that (1) the applicant does not receive credit for that period under any other provision of the Pension Code, (2) at the time of the layoff, the applicant had attained certified status under the rules of the Department of Central Management Services, and (3) the total amount of creditable service established by the applicant under this paragraph does not exceed three (3) years. For service established as provided herein, the required employee contribution shall be based on the rate of compensation earned by the employee on the date of returning to employment after the layoff and the contribution rate then in effect, and the required interest shall be calculated from the date of returning to employment after the layoff to the date of payment.

Executed: July 1, 2004

## PERSONAL PROPERTY LOSS

The Employer shall promptly pay a properly verified claim of personal property loss under Article XXV, Section 5, and in the event no line item exists to satisfy such claim, the Employer shall budget and legislatively seek an appropriation. Further, to the extent practicable, the Employer

[221]

shall expedite processing and approval of all valid, current pending or future claims before the Illinois Court of Claims.

Executed: December 12, 1984
Renewed: July 1, 2004

## PERSONAL SERVICE CONTRACTS

1. The Employer shall not employ, or cause to be employed through a firm or agency as a subterfuge to this agreement, individuals through the use of personal service contracts when the services performed under such contracts are within the scope of bargaining unit work. The Employer maintains the right to subcontract (which shall include subcontracts with employment services vendors) pursuant to Article XXIX of the master collective bargaining agreement.

2. Notwithstanding the above, the Employer may contract for personal services for a position with an individual or an agency (1) for a non-renewable period not to exceed 90 days to meet the emergency situations consistent with the conditions of section 8b.8 of the Personnel Code, or (2) for a period not to exceed 6 months out of any 12 month period which is determined to be temporary or seasonal consistent with the conditions of section 8b.9 of the Personnel Code, or (3) for a period not to exceed 6 months out of any 12 month period where there is no appropriate eligible list available consistent with the conditions of section 8b.10 of the Personnel Code.

3. The Union shall be provided with notice of all such contracts on a bi-monthly basis. Such notice shall include, at a minimum, the following information: the name of the individual; position classification he/she shall be occupying; the rate of pay; the dates of the contract; the employing department; a description of the work to be performed; and the location of the work.

4. Any contract entered into by the Employer on or after June 30, 1993 inconsistent with this Agreement shall be terminated within 45 days.

5. Notwithstanding paragraph 2 above, if the Employer desires to extend the time period for any contract, it shall notify the Union in writing, at least 14 calendar days before its termination of its desire and the reasons therefor. In addition to the original term, with the Union's concurrence, such contracts may be renewed for a period not to exceed 90 days to meet emergency situations consistent with section 8b.8 of the Personnel Code, for a period not to exceed 6 months out of any 12 month period which is determined to be temporary or seasonal consistent with section 8b.9 of the Personnel Code and for a period not to exceed 6 months out of any 12 month period when there is no appropriate eligible list available consistent with section 8b.10 of the Personnel Code.

6. The Employer may not utilize consecutive contracts for the same position except as provided above.

7. Nothing in this Memorandum prohibits the Employer from entering into personal service contracts for specialized professional or technical services which otherwise could not reasonably be provided by employees.

8. Nothing in this memorandum of agreement prohibits the Employer from entering into personal services contracts for time limited projects for up to 12 months, renewable for an additional 12 months, to meet certain agency mandates for which specific funds are dedicated.

9. The Union shall receive notice of any time limited projects set forth in paragraph 8 and their duration. Additionally, the Union shall be notified of any personal service contracts entered into as a result of paragraphs 7 and 8 above prior to their execution.

Executed: June 4, 1993
Renewed: July 1, 2004

[222]

## PERSONAL SERVICE AND VENDOR CONTRACTS

In order to establish an understanding between the parties with respect to continued implementation of the Personal Service Contract Memorandum of Understanding (PSC MOU) and provide a framework for the resolution of current and future issues and disputes between the parties regarding the PSC MOU in light of the decision of Arbitrator Terry Bethel on certain aspects of the PSC MOU, the parties have entered into this Side Letter. In so doing, the Union recognizes the Employer's continued right to utilize Personal Service Contracts pursuant to and in accordance with the Personal Service Contracts Memorandum of Understanding and the Employer's continued right to subcontract under Article XXIX of the master collective bargaining agreement. Similarly, the Employer recognizes the Union's continued interest in preserving and protecting the scope and work of its bargaining units. In recognition of the parties' interests set forth above, the parties agree as follows:

1. The Employer shall, no later than December 31, 2004, prepare and present to the Union, a strategic plan and schedule for all agencies under the Governor's Office to address the use of personal service contracts (or vendor contracts that would be prohibited if performed by employees under personal service contracts) that are, arguably, pursuant to the Bethel award, in violation of the PSC MOU and/or the master collective bargaining agreement.

2. Where the parties agree that there is a violation to be remedied, or otherwise mutually agree in the absence of acknowledgement of a violation, that a mutually acceptable resolution is desirable, the parties shall work together to achieve a remedy, resolution and/or settlement, including but not limited to phasing in remedial measures over time, establishing new positions and/or other approaches. The Employer agrees to make reasonable efforts to terminate such personal service and vendor contracts that are in violation of the PSC MOU or the master agreement as soon as feasible, but no later than December 31, 2005. Should the Employer determine that the work previously performed by said contractual employees should continue to be performed, the Employer shall either assign the work to bargaining unit employees, or if the Employer determines that the additional headcount is necessary, increase the bargaining unit headcount.

3. Nothing herein shall prevent the Union from asserting its rights to enforce the PSC MOU and master agreement, including the right to seek appropriate remedies.

Executed: July 1, 2004

## POSITION CLASSIFICATION — PROMOTIONS

1. When an employee bids for a promotional opportunity, is selected, assigned and is performing the duties of the higher rated position classification, he/she shall be paid at the higher rate of pay, whether or not training is required.

2. Mental Health Technicians I satisfactorily completing one (1) year as such and qualified to perform the work of the Mental Health Technician II position shall be promoted thereto and shall receive training currently required therefor at any time, but as promptly as possible after training becomes available.

3. LPN I's satisfactorily completing one (1) year as such and qualified to perform the work of the LPN II position shall be promoted thereto, except those employees hired and working as LPN I's prior to or about

August 1, 1976 shall be required to work only six (6) months to be eligible for promotion.

4. Direct and immediate supervision and assignment of Support Workers normally shall be the duty and responsibility of Support Service Worker Supervisor position classifications, except for completing Department of Central Management Services Form 201-R, which shall be the duty of a non-bargaining unit employee.

5. The function and responsibility of charge are duties normally exclusive to the Mental Health Technician IV position classification, where such classification is utilized.

6. The function and responsibility of relief charge (i.e., performing charge duties on the scheduled days off of the regular charge) are duties normally exclusive to the Mental Health Technician III and IV position classifications, where such classification is utilized.

7. Counting and distribution of medications to patients shall be the duty of those position classifications not proscribed by law or legal interpretation from doing so.

Executed: January 4, 1977
Renewed: July 1, 2004

---

### RC-42 JOB BIDDING

Employees in the Departments of Historic Preservation and Natural Resources in the RC-42 bargaining unit will be considered along with other employees who bid pursuant to Article XIX, Section 5 for the following RC-28 class series:

1. Natural Resources Technician I
   Natural Resources Technician II
2. Site Technician I
   Site Technician II
   Ranger
   Senior Ranger

Executed: October 9, 1991
Revised: July 1, 2004

---

### RED-CIRCLING, PAY ON PROMOTIONS

Employees whose salaries are frozen and/or red-circled, who subsequently are placed into another position classification or pay grade, shall be placed at the pay level in their new classification as if they had moved from the original classification and pay grade directly to the most recent classification and pay grade, but in any event shall be placed at a rate no less than their original frozen and/or red-circled rate.

Executed: July 1, 1989
Renewed: July 1, 2004

---

### SELECTION IN PLACE OF RECALL LIST

Where a selection has been made for a vacancy by means other than recall, and the formal written employment commitment and/or the transaction has been processed, such selection shall be implemented if a recall list is newly established for the classification within 30 calendar days following the selection, and did not exist at the time of the employment commitment.

Executed: December 12, 1984
Renewed: July 1, 2004

[224]

## SICK LEAVE — RC-6 AND 9

In light of the Sick Leave Policy issued December 13, 1979, by the Director William Boys which clearly indicates sick leave is not to be used to compensate for tardiness and absenteeism, the parties agree that employees in the RC-6 and 9 bargaining units may use sick leave in one (1) hour increments in those instances when an illness occurs after the beginning of the employee's designated starting time during a portion of the work day.

In all other instances, sick leave shall be used in accordance with Article XXIII, Section 15, of the master collective bargaining agreement.

Executed: April 21, 1982
Renewed: July 1, 2004

## SICK LEAVE BANK

1) The definition of immediate family shall be husband, wife, children, mother, father, or any person living in the employee's household for whom the employee has custodial responsibility or where such person is financially and emotionally dependent on the employee and where the presence of the employee is needed.

2) The definition of catastrophic or severe illness or injury shall be as follows: Sick Leave Banks are intended to cover temporarily disabled or incapacitated employees or members of the immediate family as defined herein and who are temporarily disabled or incapacitated due to, but not limited to, cancer, heart disease or stroke. Employees who have returned to work and have been treated for an illness or injury that meets the above definition shall also be allowed access to the Sick Leave Bank. Documentation of such illness or injury shall be consistent with applicable rules and/or contractual provisions.

3) Employees may use 25 work days from the sick leave bank per calendar year.

4) A participating employee must be a full-time employee with a minimum of 6 months service and who has exhausted all available benefit time.

5) Employees must have a minimum of 5 days of accumulated sick time on the books to enroll in the Sick Leave Bank and must have donated at least 1 day of sick leave to become a member, however, an employee may donate additional days as desired at the time of enrollment or any time thereafter.

6) Employees may voluntarily enroll at any time pursuant to #4 and #5 above but must wait 30 calendar days during the initiation of this program and 60 calendar days thereafter before utilizing the sick leave bank.

7) Each agency shall establish a single bank for all agency employees. A review committee shall be established at Central Management Services to determine employee eligibility pursuant to the guidelines established herein. For claims from employees under a collective bargaining agreement the committee shall consist of 1 agency representative, 1 union representative and 1 CMS representative. For claims from non-bargaining unit employees the committee shall consist of 1 agency representative and 2 CMS representatives. Any decision made herein shall be final and binding.

8) The Union shall be provided a copy of the forms used for determination for all claims within ten work days of the date that the determination is made.

[225]

9) Employee injuries and illnesses being compensated under the Workers' Compensation Act or Workers' Occupational Diseases Act shall not be eligible for sick leave bank use.

10) Participating employees who transfer from one Agency to another shall thereby transfer their participation in the sick leave bank.

11) Any employee shall not be eligible to withdraw the sick leave time he or she has contributed to the pool.

12) Abuse of the use of the sick leave bank should be investigated by the Agency and the Department and upon a finding of wrong doing on the part of a participating employee, that employee shall repay all sick leave days drawn from the sick leave bank and shall be subject to other disciplinary action. Information regarding the alleged misuse of the sick leave bank shall be provided to the Union members of the Committee prior to the initiation of any action against the employee.

13) Upon termination, retirement, or death, neither a participating employee nor the participating employee's estate shall be entitled to payment for unused sick leave acquired from the sick leave bank.

14) An agency which has less than twenty-five (25) days in its Sick Leave Bank shall post notice at all worksites and publicize the method of donating to the Sick Leave Bank by other appropriate means.

15) Either party may request a review of this policy and any changes shall be subject to negotiations and mutual agreement of the parties.

Executed: May 7, 1992
Revised: July 1, 2004

## SKILL TESTS

For the term of the Agreement, the Employer agrees where skill tests beyond the CMS-100B, such as clerical skill tests, are required to qualify for promotions, certified employees may take these tests during working hours with pay within the provisions of the 1977-9 contracts, not to exceed one work day per contract year in increments of not less than one-half (1/2) day at a time, or additional time if provided in Agency practices in effect as of July 1, 1977. The employee shall provide reasonable notice, and such leave shall not unreasonably be denied.

Executed: November 10, 1980
Renewed: July 1, 2004

## SMOKING POLICIES

This Agreement establishes a framework for the negotiation of Supplemental Agreements between the parties concerning smoking policies and smoke-free workplaces pursuant to Article XXV, Section 3 of the Master Agreement.

1. The Employer and the Union encourage employees, both smokers and non-smokers, to exercise courtesy with respect to individual smoking/non-smoking preferences in the work place.

2. By prior agreement, the parties recognize the value to employees of smoking cessation programs and the treatment reimbursement through health insurance. The Agency shall give due consideration to providing the cost for cessation programs for employees who are participating. However, no supplemental agreement or policies shall contain provisions to compel smokers to quit. Such programs shall be by voluntary participation.

[226]

3. The parties are committed to identifying and working to eliminate unhealthy working conditions which may exist given due consideration to the nature and requirements of the respective work locations. This commitment includes minimizing the harmful effects that smoking produces.

4. The designation of smoking areas, if any, will be resolved at the work site level within a given Agency respecting the preference of both non-smokers and smokers, through discussions between the Employer and the Union. The following guidelines will be applied:

(a) Private offices and offices, work areas, and other sites where space is shared, shall be non-smoking areas.

(b) In conference rooms and classrooms, smoking is prohibited. Breaks and appropriate access to smoking areas may be scheduled to accommodate the wishes of smokers.

(c) In cafeterias, dining areas, and employee lounges, smoking should not be permitted unless designated as a smoking area by supplemental agreement.

(d) Recognizing the goals of these policies, it is the intent of the parties that the established restrictions also be applied to the public and/or clients.

5. In those situations where inadequate ventilation in designated smoking areas cause smoke pollution detrimental to the health of employees, the Employer shall explore ventilation solutions and implement such where feasible and within agency budgetary limitations.

6. Once a Smoking Policy Agreement has been established, it must be approved by CMS and AFSCME Council 31 to insure compliance with this policy and the Master Agreement. It is the intent of the parties that there be a joint, periodic review of established policies. An employee survey form, designed after it is discussed by the parties, may be used by an Agency desiring to collect employee statistics and data for the analysis of smoking issues. Such survey data shall be furnished to the Union.

Executed: April 13, 1987
Renewed: July 1, 2004

## SPECIAL GRIEVANCES

In accordance with the provisions of Article V, Section 4, the parties agree to the following procedures for the processing of grievances pertaining to matters of:

1) Discharge, Suspensions Pending Judicial Verdict, Demotion, Geographical Transfer, Salary Grade and Layoff.

Appeals of discharges, demotions, geographical transfers, salary grade and layoffs shall be filed as a written grievance at a special Step 3 meeting with the agency head or designee within ten (10) working days of becoming aware of such action. Except for grievances involving affirmative attendance and suspensions pending judicial verdict, which shall be heard by the step 3 grievance committee, such step 3 level meetings shall be held at the work location with the agency head or designee, except that past practice with respect to those agencies which hold such meetings at a different location shall continue. However, the parties may by mutual agreement conduct such meetings at an alternate sight or in an alternate manner on a case-by-case basis. The agency head or his/her designee shall respond in writing within ten (10) working days following such meeting, or within ten (10) working days from receipt of the grievance if no meeting is held. Such grievances shall be heard on a priority basis relative to other pending Step 3 grievances.

If the Step 3 decision is rejected, the appeal to Step 4 must be within ten (10) working days of the Step 3 decision or from when such decision

[227]

was due. Such appeal shall be heard at the next pre-arbitration staff meeting after the grievance is received by the CMS Office of Employee and Labor Relations. Discharges and suspensions pending judicial verdict shall be served upon the employees with a copy to the Union.

2)  Position Reclassifications

Within fifteen (15) working days after receiving notice of a position reclassification, the Union may file a grievance in accordance with the collective bargaining agreement at Step 4.

The parties agree during the term of this agreement that position reclassifications shall not be subject to arbitration. Pursuant to Personnel Rule 301.30 (c), the matter may be appealed to the Civil Service Commission within fifteen (15) days after receipt of the Employer's decision following the pre-arbitration meeting.

3)  New Classifications

Disputes regarding the salary placement of new classifications pursuant to Article XXVI, Section 8, New Classifications, may be moved to arbitration by the Union after ninety (90) days from the date the Illinois State Labor Relations Board certifies the Union as the certified bargaining representative of the classification. The parties agree to make every effort to schedule the dispute for an arbitration hearing within sixty (60) days of when it is advanced to arbitration. The parties agree that the arbitrator selected to hear the dispute will provide a written decision to the parties within two (2) weeks following conclusion of the arbitration hearing. Such decision need not contain the arbitrator's complete rationale, but may merely uphold or deny the grievance with the accompanying remedy, if applicable. A complete decision will be furnished to the parties within thirty (30) days of the close of the record. Briefs may be filed at the request of either party.

4)  Schedule Changes

Schedule change disputes pursuant to Article XII, Section 19, Supplementary Agreements, may be moved to arbitration by either party after ninety (90) days from the first date of negotiations. The parties agree to make every effort to schedule the dispute for an arbitration hearing within sixty (60) days of when it is advanced to arbitration. The parties agree that the arbitrator selected to hear the dispute will provide a written decision to the parties within two (2) weeks following conclusion of the arbitration hearing. Such decision need not contain the arbitrator's complete rationale, but may merely uphold or deny the grievance with the accompanying remedy, if applicable. A complete decision will be furnished to the parties within thirty (30) days of the close of the record. Briefs may be filed at the request of either party.

5)  Special Grievances Procedure

1.  The parties agree that the procedures and ground rules contained in Section 4(c) shall be utilized in the resolution of grievances covered by this Memorandum of Understanding, except that the arbitrator shall provide a written decision to the parties within two (2) weeks following conclusion of the arbitration hearing. Such decision need not contain the arbitrator's complete rationale, but may merely uphold or deny the grievance with the accompanying remedy if applicable. A complete decision will be furnished to the parties within 30 days of the close of the hearing.

2.  Arbitration hearings will be scheduled within thirty (30) days of the grievance being moved to arbitration by the Union pursuant to Step 4(b) following Step 4(a) of the grievance procedure. The parties shall make every effort to have the dispute heard at an arbitration hearing to be held within sixty (60) days following the Step 4(a) signoff.

[228]

3.   The parties agree that briefs shall not be filed unless absolutely essential and then only with mutual consent of the parties. If briefs are filed, they shall be submitted within five (5) days following the arbitration hearing. The arbitrator shall then have two (2) weeks from the date the briefs are filed to render his/her decision.

4.   If there are no pending discharge or suspension grievances, the parties agree to submit other disciplinary grievances or other mutually agreeable contract interpretation grievances to the arbitrator in order to utilize the scheduled days reserved for the parties by the panel of arbitration.

6)  Individual Employee Grievance Filing

Pursuant to Section 6(b) of the Illinois Public Labor Relations Act effective July 21 1984, the parties agree that an individual employee may file and settle a grievance at the appropriate initial step of the grievance procedure without the intervention of the Union.

The appropriate initial step of the grievance procedure will generally be Step 1, but in those situations wherein a grievance is appropriately initially presented at an advance step in the procedure, such as those matters contained in the Memorandum of Understanding referred to in Article V, Section 4, and under Article V, Section 7, the advanced step will be considered the appropriate initial step of the grievance procedure.

The Union will be notified of any conference between the employee and supervisor during which the grievance will be discussed. The Union will be afforded the opportunity to be present during any such conference. However, the employee may resolve the grievance without the Union's intervention.

No settlement or resolution entered into by the employee and supervisor without the Union's intervention will be inconsistent with the existing collective bargaining agreement.

Executed: December 4, 1984
Revised: July 1, 2004

## SUPPLEMENTAL AGREEMENTS ARBITRATION PROCEDURE

Pursuant to the Memorandum of Understanding entitled "Supplementary Agreements" the parties agree that any arbitration shall be scheduled and heard within 20 working days subject to Article V, Section 1, Step 4b(1). The arbitrator shall then render a decision within 10 days following the close of the hearing.

Executed: September 5, 1997
Renewed: July 1, 2004

## SUPPLEMENTARY AGREEMENTS

All supplementary agreements are hereby renewed for the duration of the Master Contract. Any agency or local supplementary agreement can be re-opened for negotiations once during the first twelve months of the Master Contract by either party to the supplement. The supplemental is considered open after serving a thirty (30) day written notice upon the other party with copies of said notification sent to Central Management Services and AFSCME Council 31. Except as provided below, all supplementary agreements shall remain in full force and effect during negotiations and until such time as a successor supplement is completed and approved by Central Management Services and AFSCME Council 31. There may be two (2) levels of supplementary negotiations, the agency and the facility. Time and place of such negotiations shall be by mutual arrangement of the parties, but both parties agree to facilitate such meetings in order to meet the time requirements in this Agreement. The

[229]

number of employees on the Union committee for Facility negotiations shall be in accordance with past practice; the number for Agency negotiations shall be four (4) from each bargaining unit.

Subject to the provisions of the Agreement, topics of local and/or agency supplemental negotiations shall be as follows:

Facility negotiations besides including those items in Article XII, Section 19 and other matters stated such as bulletin boards, number of stewards, rest areas, etc., shall include:

1. Definition of work area for special purposes, such as overtime equalization, shift preference, days off, etc. The parties will endeavor to structure the overtime distribution units in a way to allow the distribution of overtime to take place in an equitable and efficient manner.

2. Union orientation mechanics.

3. Four-day workweek with approval of Agency.

4. Transaction report format.

5. Overtime equalization.

Agency negotiations shall include:

(a) Definition of work location for all personnel transactions as covered by the contract.

(b) Provision of aids and appliances for employees with disabilities and reimbursement.

(c) Seniority roster and transactions report.

(d) Flex time.

(e) Four-day workweek.

(f) Special joint committees.

(g) Educational leave with regards to numbers and policy.

(h) Job assignment rights upon return from leave of absence.

(i) Smoking policies.

(j) Travel policies.

Matters contained in existing supplementary agreements may also be subject for supplementary negotiations.

Agency negotiations shall include other matters as stated in the contract, such as areas for promotional bidding.

The parties may mutually agree to add or delete subjects for supplementary negotiations as the need arises.

Any supplemental that remains unsettled ninety (90) days from the first meeting shall be subject to negotiations between AFSCME Council 31 and Central Management Services. Upon a request to negotiate, the parties shall meet within fifteen (15) days to commence negotiations. In the event that negotiations remain unsettled thirty (30) days from the first meeting between CMS and AFSCME Council 31, either party may move the dispute to arbitration.

If, after good faith negotiations, impasse is reached, the Employer may implement reasonable changes if emergency situations so dictate. The outstanding issues shall be subject to arbitration pursuant to the Memorandum of Understanding on Special Grievances. In making a decision on each outstanding issue, the arbitrator shall take into consideration factors which are normally and traditionally taken into account through voluntary collective bargaining. The finding by an arbitrator that emergency conditions did not exist, does not preclude a finding for the Employer's position on the outstanding issues in arbitration.

Once a settlement has been reached, either by mutual agreement or via arbitration, two completed copies must be signed by both parties and must be submitted to the Department of Central Management Services and to AFSCME Council 31 within thirty (30) days of agreement.

No Supplementary agreements shall become effective any earlier than the effective date of the contract and until such agreements have been

[230]



approved by the Department of Central Management Services and AFSCME Council 31.
Executed: July 2, 1986
Revised: July 1, 2004

## TAX EXEMPT BENEFITS

The purpose of this Memorandum of Understanding is to provide eligible employees a means of obtaining benefits coverage on a favorable tax basis.

Effective October 15, 1985 the Employer will establish a plan for eligible employees that will qualify as tax exempt certain of their premiums for employee and dependent health, life, and dental (if available) insurance.

Statutory Authority: P.A. 84-167, effective August 16, 1985 and Section 125 of the Internal Revenue Code (26 U.S.C. 125)
Executed: July 1, 1986
Renewed: July 1, 2004

## TEMPORARY ASSIGNMENT TO THE GENERALIST SERIES RC-9, RC-62 AND RC-63

An employee, who is temporarily assigned to and subsequently selected for a position within the Generalist Series and who does not possess the training certificate to meet the qualification requirements for the higher position is to be given training, where training in that classification is provided pursuant to facility practice, and pay under the temporary pay provisions of Article XIV, providing the affected employee continues to perform the duties and responsibilities of the higher position while undergoing formal training to obtain the certificate. If, after obtaining the certificate, the employee is still unable to qualify for the higher position, due to lack of experience, the employee is to be assigned duties appropriate for the position classification to which currently assigned and paid accordingly.
Executed: December 12,1984
Renewed: July 1, 2004

## TRAINEE TITLES

The Employer recognizes AFSCME Council 31 as the exclusive bargaining representative for the employees in the attached list of classifications and who are targeted for or to be promoted to bargaining unit positions. Employees in these titles shall be subject to the provisions of the master collective bargaining agreement except as amended in this supplemental.

During this period these employees shall have no right to:
1. Utilize the grievance procedure in the event of discipline, discharge or demotion, except those employees who held certified status during their most recent period of continuous service.
2. Be appointed as a union steward or representative.
3. Liquidate accumulated vacation or request leaves of absence as outlined in Article XXIII with exception of Section 15, Sick Leave, except that Trainees may utilize vacation pursuant to Article X, Section 1, upon the completion of 6 months service.
4. Exercise the bidding and bumping provisions outlined in Article XIX, with the understanding that Article XIX, Section 2, D, is in full force and effect for the filling of vacancies upon the completion of the Trainee period.
5. Vacant Trainee positions (attached) will not be posted or subject to the bidding procedures outlined in Article XIX. The Employer

[231]

agrees to post an informational notice to employees concerning the filling of future Trainee vacancies.

6. Exercise the rights enumerated in Article XX of the collective bargaining agreement in case of layoff, except trainee employees shall have rights as set forth in Article XX, Section 4, however, such rights shall be limited to the employing agency at the time he/she was terminated non-certified. Such reappointment list shall be maintained by the agency. Upon reappointment, such trainee may be subject to additional training which shall not exceed the maximum program length set forth in this Memorandum of Understanding.

7. Based on the understanding that Trainees will not be misassigned, utilize the grievance procedure for claims of temporary assignment pay as outlined in Article XIV of the collective bargaining agreement.

The parties agree that employees hired in the attached list of classifications shall remain in such status for a period not to exceed the designated maximum program listed. Upon satisfactory completion of the designated training period or less, the employees will be promoted and serve a four (4) month probationary period in the targeted bargaining unit position.

Under any provision of the contract, employees shall not transfer to another position and/or work location unless such transfer is compatible with the training program. Trainees will be subject to working work schedules as the trainee program and past practice require.

The Employer may change the shifts and days off of the *Telecommunicator Trainee and Clerical Trainee* with 24 hours of notice in order to fulfill training needs.

The current practice regarding the *Life Sciences Career Trainee* special skills options will not be modified or affected by this Memorandum of Understanding.

Executed: March 6, 2002
Revised: July 1, 2004

( * ) See Title Specific Memorandum of Understanding

| # | Class Title | Max. Prog. Length | Barg. Unit |
|---|---|---|---|
| 1 | Accounting and Fiscal Administration Career Trainee | 12 Mos. | RC-062 |
| 2 | Actuarial Examiner Trainee | 12 Mos. | RC-062 |
| 3 | Administrative Services Worker Trainee | 12 Mos. | RC-014 |
| 4 | Behavioral Analyst Associate | 12 Mos. | RC-062 |
| 5 | Carnival and Amusement Safety Inspector Trainee | 12 Mos. | RC-062 |
| 6 | Children and Family Service Intern, Option 1 | 24 Mos. | RC-062 |
| 7 | Children and Family Service Intern, Option 2 | 24 Mos. | RC-062 |
| 8 | Clerical Trainee | 12 Mos. | RC-014 |
| 9 | Clinical Laboratory Technologist Trainee | 12 Mos. | RC-062 |
| 10 | Computer Information Consultant Trainee | 12 Mos. | RC-062 |
| 11 | Computer Systems Software Specialist Trainee | 12 Mos. | RC-062 |
| 12 | Correctional Officer Trainee ( * ) | 12 Weeks | RC-006 |

[232]

| # | Class Title | Max. Prog. Length | Barg. Unit |
|---|---|---|---|
| 13 | Data Processing Operator Trainee | 12 Mos. | RC-014 |
| 14 | Data Processing Technician Trainee | 12 Mos. | RC-028 |
| 15 | Energy and Natural Resources Specialist Trainee | 12 Mos. | RC-062 |
| 16 | Financial Institutions Examiner Trainee | 12 Mos. | RC-062 |
| 17 | Forensic Scientist Trainee | 12 Mos. | RC-062 |
| 18 | Geographic Information Trainee | 12 Mos. | RC-063 |
| 19 | Graduate Pharmacist | 12 Mos. | RC-063 |
| 20 | Health and Safety Officer Trainee | 12 Mos. | RC-062 |
| 21 | Hearing and Speech Associate | 24 Mos. | RC-063 |
| 22 | Human Services Grants Coordinator Trainee | 12 Mos. | RC-062 |
| 23 | Industrial Services Consultant Trainee | 12 Mos. | RC-062 |
| 24 | Industrial Services Hygienist Trainee | 12 Mos. | RC-062 |
| 25 | Information Services Intern | 24 Mos. | RC-063 |
| 26 | Insurance Analyst Trainee | 12 Mos. | RC-014 |
| 27 | Insurance Company Financial Examiner Trainee | 12 Mos. | RC-062 |
| 28 | Life Sciences Career Trainee | 12 Mos. | RC-062 |
| 29 | Manpower Planner Trainee | 12 Mos. | RC-062 |
| 30 | Mental Health Specialist Trainee | 12 Mos. | RC-062 |
| 31 | Mental Health Technician Trainee 1 | 12 Mos. | RC-009 |
| 32 | Methods and Procedures Career Associate Trainee | 12 Mos. | RC-062 |
| 33 | Network Control Center Technician Trainee | 12 Mos. | RC-062 |
| 34 | Psychologist Associate | 12 Mos. | RC-063 |
| 35 | Public Aid Investigator Trainee | 12 Mos. | RC-062 |
| 36 | Public Health Program Specialist Trainee | 12 Mos. | RC-062 |
| 37 | Rehabilitation Counselor Trainee | 12 Mos. | RC-062 |
| 38 | Rehabilitation/Mobility Instructor Trainee | 12 Mos. | RC-063 |
| 39 | Residential Care Worker Trainee | 12 Mos. | RC-009 |
| 40 | Revenue Auditor Trainee | 12 Mos. | RC-062 |
| 41 | Revenue Collection Officer Trainee | 12 Mos. | RC-062 |
| 42 | Revenue Special Agent Trainee | 12 Mos. | RC-062 |
| 43 | Revenue Tax Specialist Trainee | 12 Mos. | RC-062 |
| 44 | Security Therapy Aide Trainee | 12 Mos. | RC-009 |
| 45 | Social Service Aide Trainee | 36 Mos. | RC-006 |
| 46 | Social Services Career Trainee – Option 1 | 12 Mos. | RC-062 |
| 47 | Social Services Career Trainee – ( * Option 2 ) | 48 Mos. | RC-062 |
| 48 | Telecommunicator Trainee | 12 Mos. | RC-014 |
| 49 | Weatherization Specialist Trainee | 12 Mos. | RC-062 |
| 50 | Youth Supervisor Trainee ( * ) | 12 Weeks | RC-006 |

[233]

### TRANSFER POLICY FOR RC-6 EMPLOYEES

An RC-6 employee who has at least eighteen (18) months seniority and desires to transfer to the same or lower position classification in the same classification series, an equal or lower position in a classification in which an employee was previously certified, or a position lower in the series in which an employee was previously certified, and for which he/she is qualified at a different work location (including employees desiring to transfer from the Correctional Officer series to the Youth Supervisor series, and vice versa) shall file a request for transfer form with the Agency Personnel Office. The Agency Personnel Office shall send copies of the transfer request form to the personnel liaison(s) responsible for handling personnel transactions for both the employee's current institution and the institution the employee indicates he/she wishes to transfer to. Such request for transfer will be effective twenty-four (24) months from the date received in the Agency Personnel Office.

The following parameters are agreed to between AFSCME Council #31, the Department of Corrections, and the Department of Central Management Services:

1. During each contract year, no more than 5% of the RC-6 employees in an institution may exercise this right.

2. When an employee transfers from an institution, no other employee in the same position classification will be allowed to transfer from that institution, unless operational needs permit, until the transferred employee's position is filled.

   However, an employee's effective date of transfer shall be the date he/she otherwise would have been transferred and the position for which the employee was selected shall be held vacant until the employee is able to physically transfer.

3. An institution will not be required to fill more than 33 1/3% of the approved vacancies per contract year via employees transferring from one work location to another pursuant to this Agreement.

   When vacancies are approved to be filled and a transfer agreement is on file, the first and second vacancies shall be filled by the institution's normal process consistent with Article XIX, Section 2. Prior to filling an approved vacancy through other means available, the third vacancy shall be filled by an eligible transferee consistent with Article XIX, Section 2. Such remaining vacancies shall be filled on a similar alternating basis until all remaining transfer requests of eligible employees have been honored. If vacancies remain, they shall be filled through the normal filling of vacancy process.

   The placing of a Trainee who has satisfactorily completed the training requirements for a targeted position pursuant to Article XIX, Section 2-D does not increase an institution's headcount and will not count as either the filling of vacancy category or the transfer category.

4. An employee who has been suspended for more than thirty (30) days within the twenty-four (24) months immediately preceding the effective date of transfer shall not be permitted to transfer. An employee who has been suspended for more than five (5) days within the twelve months immediately preceding the effective date of transfer shall not be permitted to transfer. An employee who has been suspended for five (5) days or less within the twelve months immediately preceding the effective date of transfer shall not be permitted to transfer unless six (6) months or more have elapsed between the date the last suspension was imposed and the effective date of transfer.

[234]

5. An employee who is on "furnish-proof" status shall not be eligible for transfer under this Agreement.

6. All transferred employees will be provided the regular orientation and/or regular refresher course in the new institutions.

7. An employee who exercises his/her right to transfer will not be eligible to transfer again for twenty-four (24) months from the effective date of the transfer, except that employees transferring between work locations within the same work county shall not be permitted to transfer for a period of thirty (30) months from the effective date of transfer.

8. Except during the initial staffing of a new institution, an employee transferring under the provisions of this Agreement, or transferring by other means, shall not be able to exercise his/her seniority for promotional purposes, a days off schedule and/or shift preference for a period of twelve (12) months from the effective date of the transfer.

9. The name of an employee who declines an offer to transfer under the terms of the Agreement shall be removed from the transfer request list. Such employees may resubmit a transfer request after six (6) months have elapsed from the date the transfer offer was declined.

10. The initial staffing of a new institution shall be done in accordance with the procedures outlined in #3 above except that 25% of the approved vacancies are required to be filled in this manner.

This Agreement shall be effective July 1, 2004 and shall remain in effect until June 30, 2008, unless either party gives notice of its desires to reopen negotiations on this Agreement 30 days prior to July 1, 2008. This Agreement shall remain in full force and effect during the period of such negotiations.

Executed: July 1, 1994
Revised: July 1, 2004

---

## TRANSFER POLICY FOR RC-9 EMPLOYEES

RC-9 employees, except employees desiring transfer who have not completed their original six (6) month probationary period, desiring to transfer to the same or lower position classification in the employee's classification series in a different facility shall file a request for transfer form which shall be effective for one year with the Personnel Officer at the facility to which the employee desires to transfer.

The following parameters are agreed to by AFSCME Council 31 and the Department of Human Services:

1. During each contract year, no more than 5% of RC-9 employees in a facility may exercise this right.

2. A facility will be required to fill no more than 50% of the vacancies per position classification in this manner pursuant to Article XIX, Section 2, Filling of Vacancies.
   When vacancies are to be filled and a transfer request is on file, the first vacancy is filled by the facility's normal process. The second vacancy is filled by an eligible transferee. Such remaining vacancies shall be filled on an alternating basis until all remaining transfer requests of eligible employees have been honored. If vacancies remain, they shall be filled through the normal filling of vacancy process.

3. Any employee who has been suspended within the preceding six (6) months of the transfer opportunity shall not be eligible for transfer under this agreement.

[235]

4. All transferred employees must successfully complete the regular orientation and/or regular refresher training program in the new facility if such training or orientation is made available to the employee. Any employee who fails to successfully complete such orientation and/or training within three months of transfer must return to his/her original facility in the employee's current classification. Such return shall be considered by the parties as a voluntary action. Employees thus impacted shall not be eligible for other transfer opportunities for 18 months from the date of the first transfer.

5. An employee who exercises his/her right to transfer will not be eligible to transfer again for 18 months from the effective date of the transfer.

6. Employees transferring under the provisions of this Memorandum of Understanding shall not be able to exercise their seniority for promotional purposes for a period of one year.

7. Transfer under the language shall apply to Article XIX, Section 2A(d), Filling of Vacancies.

8. The name of an employee who declines an offer to transfer under the terms of the agreement shall be removed from the transfer request list.

Executed: July 1, 1989
Renewed: July 1, 2004

## VACANCY LISTING

The parties agree that in addition to the job openings required to be maintained on a central list pursuant to Article XV, Section 7, the Employer will maintain on that same central list all job openings in all job classifications which are covered by the Master agreement, as listed in Appendix A.

Executed: July 27, 1989
Renewed: July 1, 2004

## WELFARE AND WELFARE TO WORK PROGRAM — ALL UNITS

This agreement is made and entered into by and between the Illinois Department of Central Management Services, and all Departments, Boards and Commissions subject to the Illinois Personnel Code, ("Employer") and the American Federation of State, County and Municipal Employees — AFL-CIO ("Union"), on behalf of its affiliated locals and the employees in the collective bargaining units.

1. Welfare recipients and Welfare To Work participants will not displace or replace regular employees. For example, if there are ten Office Aides and five Welfare recipients and Welfare To Work participants, and two Office Aides retire, the Employer will not replace the two regular vacant positions with two additional Welfare recipients and Welfare To Work participants raising their number to seven. This policy, however, does not require the Employer to fill vacancies which they desire to keep vacant.

2. Bargaining unit work that constitutes the normal duties and responsibilities of regular employees on current payroll and will not be removed and reassigned to Welfare recipients and Welfare to Work participants. Welfare and Welfare to Work participants will be assigned work in a manner that will not jeopardize the job classification of the current employees.

[236]

3. Welfare and Welfare to Work assignments will in no way interfere with the contractual procedures for filling vacancies. The contractual procedures will be used for filling bargaining unit vacancies.

4. The Union will be notified when a State agency determines to use Welfare recipients and Welfare to Work participants.

   The Union agrees not to appeal or grieve the Employer's initiation or continuation of programs consistent with this agreement and relevant laws.

Executed: December 12, 1984

Renewed: July 1, 2004

[237]